DECISION
{¶ 1} Relator, Robert D. Wise ("relator"), filed this original action seeking issuance of a writ of mandamus directing respondent, Industrial Commission of Ohio ("the commission"), to: (1) vacate its order dated January 10, 2003; (2) grant relator's motion to *Page 2 
set aside and vacate the settlement agreement on his claim; and (3) reinstate his worker's compensation claim No. 95-551289.
 {¶ 2} We referred this matter to a magistrate pursuant to Loc.R. 12(M) of this court and Civ.R. 53. The magistrate issued a decision dated May 26, 2006. (Attached as Appendix A.) In that decision, the magistrate concluded that relator is not entitled to the requested writ of mandamus. Relator filed objections to the magistrate's decision, and the commission filed a memorandum contra. For the reasons that follow, we overrule relator's objections and adopt the magistrate's decision.
 {¶ 3} On November 17, 1995, relator suffered an industrial injury while working for the employer, Urban Industries of Ohio, Inc. The claim was allowed for "fracture left tibia-closed." On November 20, 1995, relator underwent surgery for a "left open reduction internal fixation with iliac crest bone grafting to the lateral tibial plateau." Temporary total disability was allowed from November 18, 1995 to January 14, 1996. Thereafter, relator was periodically examined by Dr. James R. Kerbs. Approximately one year after the injury, on November 21, 1996, Dr. Kerbs wrote that relator "is going to have a slight amount of valgus instability in the left knee secondary to the depression of the fracture, as well as more than likely an earlier onset of arthritis secondary to the trauma, than he will on the other side."
 {¶ 4} On April 8, 1997, the employer's third-party administrator wrote a letter to relator about the possibility of reaching a final settlement of relator's claim. The letter informed relator of the administrator's opinion that a settlement might be in relator's best interest, and that the settlement proposal took into account future costs and available *Page 3 
awards. The administrator proposed to settle relator's claim for a lump sum payment of $2,000. The pre-printed settlement application form included an instruction requiring the parties to "[c]learly set forth the circumstances by reason of which the proposed settlement is deemed desirable." No response to this instruction was provided by either party.
 {¶ 5} Relator signed the settlement agreement on June 2, 1997. The employer's representative signed the agreement on July 2, 1997. By letter dated July 30, 1997, respondent, Bureau of Workers' Compensation ("BWC"), notified the parties that the settlement had been approved as provided in R.C. 4123.65, and that the $2,000 would be paid in 30-days unless one of the parties withdrew their consent to the settlement within that time period. In September of 1997, BWC paid the $2,000 to relator.
 {¶ 6} On March 11, 2002, relator, through counsel, filed a motion seeking to have the settlement agreement set aside. In the motion, relator argued that he was not represented by counsel at the time the agreement was entered into, and that he lacked sufficient mental capacity to acknowledge and understand the terms and import of the settlement.
 {¶ 7} A hearing was held on April 30, 2002 before a district hearing officer ("DHO"). The DHO concluded that relator could not meet the requirements necessary to invoke continuing jurisdiction by the commission. The DHO also rejected relator's argument that the settlement application form failed to comply with R.C. 4123.65 since the form did not include an explanation of the circumstances making the settlement desirable. The DHO cited testimony by relator's mother stating that she was sure relator's *Page 4 
father would have reviewed the documents presented before he would have allowed relator to sign them. Finally, the DHO rejected relator's argument that BWC should have known that relator could not understand the ramifications of the settlement agreement. The DHO therefore overruled relator's motion.
 {¶ 8} Relator appealed this decision to a staff hearing officer ("SHO"), and a hearing was held on July 8, 2002. Relator offered into evidence a report prepared by Beal D. Lowe, Ph.D. ("Dr. Lowe"), in which Dr. Lowe concluded that, given his mental functioning, relator could not have understood the settlement agreement he signed. The SHO recognized that relator had some "lack of sophistication," but pointed out that relator was not under a guardianship, maintained checking and savings accounts and understood the difference between the two, and had purchased four automobiles during his lifetime. The SHO then affirmed the DHO's decision.
 {¶ 9} Relator then appealed the SHO's decision to the commission. By a 2-1 vote, the commission denied relator's appeal, finding no mistake of fact or law such that the commission could invoke continuing jurisdiction over the case. Relator ultimately filed this action.
 {¶ 10} In order to establish the right to a writ of mandamus, relator must show that the commission abused its discretion by entering an order that is not supported by any evidence in the record. State ex rel.Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76, 26 OBR 66,497 N.E.2d 70. Where the record shows "some evidence" supporting the commission's findings, there is no abuse of discretion, and mandamus is not appropriate. *Page 5 State ex rel. Lewis v. Diamond Foundry Co. (1987), 29 Ohio St.3d 56,29 OBR 438, 505 N.E.2d 962.
 {¶ 11} R.C. 4123.52 provides for continuing jurisdiction by the commission over its cases. However, there are some limits on the commission's ability to exercise continuing jurisdiction. The requirements for the exercise of continuing jurisdiction are: (1) new and changed circumstances, (2) fraud, (3) clear mistake of fact, (4) clear mistake of law, or (5) error of an inferior tribunal. State exrel. Nichols v. Indus. Comm. (1998), 81 Ohio St.3d 454, 692 N.E.2d 188. As the magistrate pointed out, the SHO's decision did not specifically address the issue as one of continuing jurisdiction, but the commission did consider relator's argument that continuing jurisdiction could be invoked based upon a mistake by an inferior tribunal (BWC) in the processing of the settlement agreement in this case.
 {¶ 12} Throughout the course of this action, and in his objections to the magistrate's decision, relator advances two arguments supporting his claim that continuing jurisdiction can be invoked in this case. First, relator argues that the settlement agreement was void because it failed to strictly comply with the requirements set forth in R.C. 4123.65(A). That section provides, in relevant part, that an application for approval of a worker's compensation claim must "clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable[.]" To help effectuate this requirement, the standard form application for approval of settlements includes a section for the parties to provide this information, but in this case, that portion of the form was left blank. *Page 6 
 {¶ 13} In support of his claim that the failure to provide this information on the application for approval of the settlement requires a finding that the settlement is void, relator points to State ex rel.Jones v. Conrad, 92 Ohio St.3d 389, 2001-Ohio-207, 750 N.E.2d 583, arguing that the case stands for the proposition that any settlement that does not strictly comply with R.C. 4123.65 is either void or voidable. Jones involved an attempt by an employer to withdraw its consent to a settlement agreement pursuant to language contained in R.C.4123.65 allowing either party to a settlement agreement to withdraw its consent within 30-days after approval of the settlement by providing written notice to both BWC and the other party. The employer inJones notified BWC of its withdrawal from the settlement, but not the employee, who was notified of the withdrawal by BWC. The employee brought an action to enforce the settlement agreement.
 {¶ 14} The court granted the employee's application to enforce the settlement agreement, finding that the clear and unambiguous language in R.C. 4123.65(C) requiring that the notice be provided to both BWC and the other party was a requirement that was not fulfilled by BWC's notification to the employee of the employer's withdrawal from the settlement agreement. Id. at 392. Since the duty of notification was specifically placed on the party withdrawing from the agreement, notification by BWC as a third-party did not fulfill the statutory requirement. Id.
 {¶ 15} The magistrate rejected relator's argument that the failure to fill in the blank on the settlement application approval form made the settlement void or voidable. In doing so, the magistrate considered R.C.4123.65(D), which sets forth the procedure for a settlement to be approved by an SHO, who must determine whether a settlement is *Page 7 
"clearly unfair." The clear purpose for requiring the parties to set forth the circumstances why a settlement is desirable is to assist the SHO in making this finding, but as the magistrate pointed out, R.C.4123.65(D) does not confine the SHO's inquiry to the settlement application. The magistrate concluded that, notwithstanding the failure to fill in the blank on the application form, there was sufficient evidence in front of the SHO to support the conclusion that the settlement of relator's claim was not "clearly unfair."
 {¶ 16} We agree with the magistrate's analysis on this issue. TheJones decision is distinguishable because that case involved a statutory duty placed squarely on only one party to a settlement agreement, whereas the duty to set forth the circumstances making a settlement desirable is one placed with both parties. It would not be appropriate to establish a bright line rule holding the failure to include a specific statement setting forth the circumstances making a particular settlement desirable results in the settlement being either void or voidable by either party, even where other information in the record makes it possible for the SHO to fulfill the duty set forth in R.C.4123.65(D). We also agree with the magistrate's conclusion that there was sufficient evidence in the record for the approving SHO to evaluate the settlement as required, even in the absence of the information sought by the application form. Thus, we overrule relator's first objection.
 {¶ 17} In his second objection, relator argues that the magistrate incorrectly concluded that the commission was within its discretion when it found relator was competent to settle his claim. At the DHO hearing, relator argued that the employer was aware of relator's diminished capacity and exercised undue influence on him to execute a settlement of his claims. Relator also argued that BWC should have known from *Page 8 
submitted documents that relator's capacity was diminished, and therefore should have refused to accept the settlement.
 {¶ 18} The DHO rejected these arguments, relying on testimony by relator's mother that she was certain relator's father reviewed the proposed settlement and would have advised relator on how to proceed, and on evidence that relator was not under a guardianship and had graduated from high school. The DHO also rejected relator's assertion that BWC should have recognized relator's diminished capacity. For the SHO hearing, relator submitted the mental functional capacity evaluation report prepared by Dr. Lowe, in which Dr. Lowe stated that relator's IQ scores placed him in the low end of the borderline range for mental retardation. Thus, Dr. Lowe concluded that relator could not have understood the terms and ramifications of the settlement agreement at the time he signed it.
 {¶ 19} Relator argues that Dr. Lowe's report was the only evidence regarding relator's mental capacity to sign the settlement agreement, and that the SHO and commission failed to consider the report. Relator further argues that the lack of any evidence opposing Dr. Beal's report establishes that there was not "some evidence" in the record to support the denial of relator's claim regarding his capacity to sign the settlement agreement. However, it is clear that there was some evidence other than Dr. Beal's report in the record. First, there was the evidence relied upon by the DHO regarding relator's father's role in reviewing the proposal, and the evidence that relator is not under a guardianship and graduated from high school. In addition, the SHO pointed to evidence that relator has both checking and savings accounts, and understands the *Page 9 
difference between the two; and that relator has a driver's license and has purchased motor vehicles.
 {¶ 20} There was some evidence supporting the conclusion that relator was not incompetent to enter into the settlement agreement. Consequently, the commission did not abuse its discretion in reaching this conclusion. Therefore, we overrule relator's second objection to the magistrate's decision.
 {¶ 21} Having overruled relator's objections to the magistrate's decision, we adopt the magistrate's decision denying relator's request for a writ of mandamus.
Objections overruled; writ of mandamus denied.
 PETREE and KLATT, JJ., concur. *Page 10 APPENDIX A MAGISTRATE'S DECISION {¶ 22} In this original action, relator, Robert D. Wise, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order *Page 11 
denying his motion to set aside a settlement agreement and to enter an order granting his motion.
Findings of Fact:
 {¶ 23} 1. On November 17, 1995, relator sustained an industrial injury while employed as a laborer for respondent Urban Industries of Ohio, Inc. ("Urban Industries"), a state fund employer. The industrial claim was allowed for "fracture left tibia-closed" and is assigned claim No. 95-551289.
 {¶ 24} 2. On the date of injury, relator was transported to a hospital emergency room where he was examined by James R. Kerbs, M.D., who wrote:
 HISTORY OF PRESENT ILLNESS: The patient is a 33 year old male who works for Urban Industries and apparently was up on a platform area where he stepped backwards and tripped and fell landing on his left leg. He felt pain in the left leg and was brought to the emergency room where he was noted to have some gradual swelling and moderate pain along the lateral aspect and was noted to have a fractured left tibial plateau.
 * * *
 Physical examination shows a well developed male who appears slightly developmentally delayed.
 * * *
 Diagnostic studies include radiographs of the left knee which show a depressed split type fracture of the left lateral tibial plateau. There is gross depression of the central lateral tibial plateau articular surface with a posterior lateral corner which is split with a small amount of displacement and angulation.
 DIAGNOSIS: A Left Split Depression Lateral Tibial Plateau Fracture. *Page 12 
 PLAN: At this point, we discussed with him the options and we placed him in a Schanz wrap with a knee immobilizer, asked to be nonweight bearing, and instructed him on crutches. He will be set up for an urgent open reduction internal fixation of the left tibial plateau fracture with iliac crest bone grafting and internal fixation. The risks of post traumatic arthritis have been explained to him and we will proceed with this as soon as possible.
 {¶ 25} 3. On November 20, 1995, relator underwent a "left open reduction internal fixation with iliac crest bone grafting to the lateral tibial plateau." The surgery was performed by T.F. Ebner, M.D. Dr. Kerbs assisted.
 {¶ 26} 4. On December 4, 1995, Dr. Kerbs wrote:
 Robert is here in follow-up for his left lateral tibial plateau fracture, that has some comminution interarticular depression. He is two weeks follow-up from surgery. He states that he is having very minimal pain.
 Examination today shows his incision to be healing well, he is neurovascular intact. He has moderate swelling over the knee area. He has zero to 90 degrees of flexion. Hip incision appears to be benign as well.
 Radiographs show the articular surface to be fairly well-maintained. The posterior fragment continues to have some displacement. One of the posterior screws of the buttress plate does appear to be backing out a little bit, but otherwise the plate is in place.
 PLAN: At this point I have asked him to be careful with his weight bearing status. I asked him to be nonweight bearing, to work with range of motion, some strengthening, and follow-up in four weeks with an AP, lateral, and oblique view of the left knee.
 {¶ 27} 5. On December 22, 1995, the Ohio Bureau of Workers' Compensation ("bureau") allowed the claim and awarded temporary total disability ("TTD") compensation *Page 13 
from November 18, 1995 to January 14, 1996 and to continue upon submission of medical reports.
 {¶ 28} 6. Following the November 20, 1995 surgery, Dr. Kerbs examined relator periodically to monitor relator's condition. On November 21, 1996, Dr. Kerbs wrote:
 Robert is here in one year follow-up for his left tibial plateau fracture. His only complaints seem to be of some vague pain, and difficultly going up and down stairs secondary to weakness.
 Examination today again shows him to have a mild amount of valgus deformity. He is neurovascular intact. His knee is stable through 0-110 degrees of motion.
 Radiographs show the fracture to have no change in position. Hardware is still in good position. He has a little bit of settling along the lateral side, and probably some early post traumatic osteoarthritis which he has had for quite sometime.
 PLAN: At this point I want him to continue working with strengthening exercises, as I think this is his limiting factor. As his strength returns, I think that he will be able to go up and downstairs easier.
 As far as long term, I think that his left knee will not be normal. He is going to have a slight amount of valgus instability in the left knee secondary to the depression of the facture, as well as more than likely an earlier onset of arthritis secondary to the trauma, than he will on the other side. The onset of this is unknown as far as time goes, and he can follow this along through his life. Follow-up with me will be on a p.r.n. basis at this point.
 {¶ 29} 7. By letter dated April 8, 1997, a "settlement advisor" for Urban Industries' third-party administrator informed relator:
 We represent Urban Industries of Ohio, risk #219767, in all matters pertaining to their Ohio workers compensation. *Page 14 
Upon discussing this claim with the employer, it is our mutual opinion that a full and final settlement may be in your best interest. Settlement takes into account the future costs and available awards. We are prepared to offer $2,000 as a full and final settlement. Please let us know if you are in agreement with this settlement amount by signing the enclosed application and returning to me in the envelope provided. The application will then be filed with the Bureau of Workers' Compensation.
 When the Bureau has reviewed our agreement, an order will be issued and sent to all parties. Approximately 30-days after the order is mailed, a check will be sent to you as a full and final settlement. This will mean a final closure of this claim against Urban Industries.
 Please consider this opportunity carefully and contact me with any questions * * * .
 {¶ 30} 8. The settlement application form at issue here contains the following preprinted instruction or query:
 Clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable.
There was no response to the above instruction or query on the settlement application at issue here.
 {¶ 31} 9. Relator placed his signature on the settlement agreement on June 2, 1997. The employer's representative signed the agreement on July 2, 1997.
 {¶ 32} 10. By letter dated July 30, 1997, the bureau notified the parties of its approval of the application for a lump sum settlement in the amount of $2,000. The letter stated that the amount of settlement would be paid to the employee 30-days after the approval date unless within such 30-day period the employee, employer, or the administrator withdraws consent to the agreement by providing written notice. *Page 15 
 {¶ 33} 11. Pursuant to R.C. 4123.65(D), a staff hearing officer approved the settlement agreement. However, because relator's claim file was destroyed in accordance with the bureau's claim file retention policy, the order of the staff hearing officer ("SHO") approving the settlement agreement is not available.
 {¶ 34} 12. Neither the employee, employer, or administrator withdrew consent within the 30-day period. Accordingly, in September 1997, the bureau paid relator the sum of $2,000.
 {¶ 35} 13. On March 11, 2002, relator, through counsel, moved that the settlement agreement be set aside. The motion asserted that relator was unrepresented at the time of the settlement and that relator was "not of sufficient mental capacity to acknowledge and understand the import of the settlement."
 {¶ 36} 14. Following an April 30, 2002 hearing, a district hearing officer ("DHO") issued an order denying relator's motion. The DHO's order explains:
 It is the finding of the District Hearing Officer that the claimant's request that the Industrial Commission invoke continuing jurisdiction is denied.
 Pursuant to ORC 4123.52, the Commission's continuing jurisdiction is not unlimited. The District Hearing Officer notes that in order to invoke continuing jurisdiction, there must be new and changed circumstances subsequent to the initial order, fraud, clerical error, or error by an inferior administrative tribunal or subordinate hearing officer.
 In the case at bar, claimant's counsel is alleging that continuing jurisdiction should be invoked under the theory of an error by an inferior tribunal in that the BWC should have personally contacted the claimant to see if he wanted the settlement and to advise if a fair amount had been assessed in the settlement offer. *Page 16 
 Further, claimant's counsel contended that the employer exercised undue influence over the claimant, as claimant was not fully competent and sophisticated to understand the ramifications of his claim. The District Hearing Officer disagrees.
 The District Hearing Officer finds that claimant's counsel has failed to establish any error on the part of the BWC with respect to the processing and acceptance of the settlement action. Further, the District Hearing Officer rejects the argument under ORC 4123.65 that the Settlement application does not set forth the terms of the circumstances.
 The District Hearing Officer finds that the 4/08/1997 letter from Frank Gates to the claimant specifically states that a "full and final settlement may be in your best interest." The letter further details that a settlement "takes into account the future costs and available awards" and further indicates that a settlement means a "final closure of the claim."
 The District Hearing Officer rejects claimant's counsel's argument that the employer exercised undue influence on the claimant in pursuing the settlement and making an offer of $2000.00, as the employer was aware that the claimant was of diminished mental capacity.
 Claimant's mother testified at hearing that she was certain that her husband would have read the 4/08/1997 letter and would have advised their son on how to proceed in regard to this matter.
 Claimant's mother also testified at hearing that her son did not have an appointed Guardian Ad Litem. The claimant testified that he did receive a high school diploma.
 Lastly, the District Hearing Officer rejects counsel's argument that the BWC should have known that claimant had diminished capacity by observing his signature on the Patient Registration Form from Galion Community Hospital of 4/04/2001 and deduced that the claimant could barely read and write and that the BWC should have gleaned from this document that the claimant could not understand the value or *Page 17 
ramification of his executed Settlement Agreement. This assertion is wholly unsubstantiated.
 While the District Hearing Officer recognizes that the claimant may not be versed or sophisticated in the legal community, the District Hearing Officer does not find that the claimant was somehow coerced by the employer or BWC into executing the Settlement Agreement. To the contrary, claimant's mother testified at hearing that she was certain her husband would have discussed the proposed offer with their son and provided him guidance.
 Further, the District Hearing Officer finds that the Settlement Agreement specifically sets forth the terms of a settlement, including the ramifications of future medical services.
 Based on the totality of the evidence, the District Hearing Officer finds that the claimant has failed to meet any of the criteria set forth under ORC 4123.52 in which to invoke continuing jurisdiction. Further, the District Hearing Officer finds that the contention that the employer exercised undue influence over this claimant in regard to the execution of this Settlement Agreement is totally unfounded by any evidence or argument set forth at hearing. Lastly, the District Hearing Office does not find it incumbent on the BWC to assume responsibility to contact unrepresented claimants and ascertain if they truly wish to settle a respective claim or that the BWC should somehow be put on notice by observation of a claimant's handwriting that an individual lacks sufficient mental capacity in which to knowingly enter into a Settlement Agreement of his or her own accord.
 All evidence was reviewed and considered, including 4/08/1997 letter from Frank Gates, Settlement Application executed by claimant on 6/02/1997, 7/10/1997 letter from BWC Settlement Team, ORC 4123.52 and testimony adduced at hearing, including claimant and claimant's mother.
 {¶ 37} 15. Relator administratively appealed the DHO's order of April 30, 2002.
 {¶ 38} 16. On June 20, 2002, at his own request, relator was interviewed by Beal D. Lowe, Ph.D. In his report dated June 24, 2002, Dr. Lowe states: *Page 18 
 REASON FOR REFERRAL
 Mr. Wise was referred for assessment of his mental functional capacity and, specifically, to address the issue of whether he had intellectual competence to understand the consequences of a claim settlement offer which he signed in 1997.
 BACKGROUND DATA
 Referral materials report that as a result of a 1995 industrial injury, Mr. Wise's claim has been allowed for "fractured left tibia." The same referral materials indicate that in 1997, Mr. Wise received, and signed, a letter offering a full and final settlement of his industrial clam for $2000.
 BWC Hearing Officer Lisa Davidson (5/1/02) found that Mr. Wise had signed this document without "undue influence" and that he was not coerced. Suggestion by counsel that Mr. Wise "could not understand the value or ramifications of his executed Settlement Agreement" was found to be wholly unsubstantiated.
 BEHAVIORAL OBSERVATIONS AND INTEVIEW DATA
 Mr. Wise presented for the interview accompanied by his mother and an older brother. After this interviewer found Mr. Wise to be a poor historian and to have little effective grasp of the necessary historical data, his mother was relied upon to proved [sic] most factual data about school performance and work history. Mr. Wise presented with a cane to assist in ambulation. Overall grooming and appearance were poor. His speech tended to be guttural and often difficult to understand. His responses generally indicated partial, or no, ability to respond in a reliable way to questions of facts and history. His overall appearance and performance suggested significant mental limitations and reduced social and interpersonal competence.
 Mr. Wise was asked to read a copy of the Settlement Agreement, which he had reportedly signed in 1997, in the presence of this examiner. While he was able to slowly and [sic] read most of the words in this document, questioning regarding his comprehension indicated that he did not understand its meanings. *Page 19 
 Mr. Wise reports that his only work experience has been as a Janitor.
 School records were reviewed and found to reveal that Mr. Wise had been enrolled in classes for the Educably Mentally Retarded throughout his school career. He graduated in 1981, having spent his last year in a vocational training program. He was allowed to attend this program for "an extra year" following graduation.
 Test records contained in school reports provided by Mr. Wise'[s] mother indicates that in 1980 (the year before his graduation) he had Word Recognition skills at the 4.2 grade level, Reading Comprehension at the 4.5 grade level, Math Skills at the 4.9 grade level and Spelling Skills at the 2.9 grade level. No IQ scores were found in the school records.
 TEST RESULTS
 The Wide Range Achievement Test-3 was administered to assess current reading abilities. This assessment finds Mr. Wise to presently be reading at the 4th grade level.
 The WAIS-R was administered to assess intellectual abilities and IQ. This instrument finds Mr. Wise to have a Verbal IQ of 71, a Performance IQ of 75 and Full Scale IQ of 72. These scores place Mr. Wise'[s] intelligence at the Low End of the Borderline Range (lowest 6% of the population). To indicate the level of impairment, it is noted that a score of 69 would have placed him in the Mentally Retarded range (lowest to 3% of the population).
 SUMMARY AND CONCLUSIONS
 This assessment finds more than an adequate basis for concluding that Mr. Wise did not understand the Settlement Agreement document which he reportedly signed in 1997.
 First, Mr. Wise'[s] reading comprehension is inadequate to permit him to understand the vocabulary in that document. His reading comprehension was assessed in the past, and again at the time of this evaluation, as being at the 4th grade level. The document which he signed contains vocabulary and concepts far beyond this level. *Page 20 
 Second, in light of current intelligence test results which find him to be nearly in the Mental Retardation range of intelligence, he is found to lack capacity for independent, competent judgment such as is called for to sign a meaningful and consequential document such as the Settlement Agreement.
 In summary, this assessment finds that Mr. Wise is not competent, as a result of his limited reading comprehension and limited intelligence, to understand the consequences and ramifications of his signature to the Settlement Agreement.
 {¶ 39} 17. Following a July 8, 2002 hearing, a SHO issued an order affirming the DHO's order of April 30, 2002. The SHO's order explains:
 The injured worker settled this claim in 1997 for two thousand ($2,000.00). There is no evidence that any party, the BWC or the employer tried to take advantage of the injured worker by settling the claim.
 The injured worker did appear at hearing to have some "lack of sophistication," as noted by a Staff Hearing Officer in an order of 04/22/2002. The nature of the injured worker's past work experience would not require great mental capacity. However, this individual is not under a guardianship. He testified at hearing to having both a checking and savings account. He understood the reason for the accounts was to obtain "better interest." He testified as to obtaining a driver's license at 17. He also stated that he has purchased 4 automobiles in his life and that he currently owns a car.
 The injured worker is currently involved with active contracts. Further, there is no evidence that $2,000.00 to settle this claim in 1997 was unreasonable or unjust.
 {¶ 40} 18. Relator administratively appealed the SHO's order of July 8, 2002.
 {¶ 41} 19. Following a November 14, 2002 hearing before the three-member commission, the commission issued an order, with one member dissenting, that affirms *Page 21 
the SHO's order of July 8, 2002. The commission's order, with two members concurring states:
 On 03/11/2002, the injured worker filed a motion requesting that the Industrial Commission set aside a settlement agreement, dated 07/30/1997 for the alleged reasons that the injured worker lacked the mental capacity to enter into the settlement agreement and that the injured worker was unrepresented at the time he entered into the settlement agreement.
 Counsel for the injured worker argued that, pursuant to R.C. 4123.52, the Industrial Commission has authority to invoke continuing jurisdiction based upon a mistake by an inferior tribunal (Bureau of Workers' Compensation), when it processed the settlement agreement.
 It is the finding of the Industrial Commission that it does not have authority to invoke continuing jurisdiction for the reason that the injured worker failed to meet his burden of proving that the Staff Hearing Officer order of 07/08/2002 contained a mistake of fact or law of such character that remedial action would clearly follow. The Staff Hearing Officer stated, "There is no evidence that any party, the Bureau of Workers' Compensation or the employer tried to take advantage of the injured worker by settling the claim." More specifically, the Industrial Commission finds, pursuant to the provisions of R.C. 4123.65, that the injured worker failed to provide sufficient evidence that the settlement agreement was "clearly unfair" or a "gross miscarriage of justice." There is no basis, therefore, for the Commission to invoke its continuing jurisdiction. Therefore, the injured worker's appeal, filed 07/25/2002, is denied and the Staff Hearing Officer order, dated 07/08/2002, remains in full force and effect.
 {¶ 42} 20. The dissenting commissioner wrote:
 I respectfully dissent from the majority's order in this matter. I would grant the claimant's 07/25/2002 appeal, vacate the Staff Hearing Officer's 07/08/2002 order and grant the claimant's 03/11/2002 C-86 motion. *Page 22 
 The Ohio Supreme Court has recently and clearly stated that all the requirements specifically enumerated in R.C. 4123.65 must be strictly adhered to before a settlement of a workers' compensation claim can legally be effectuated. Gibson v. Meadow Gold Dairy (2000), 88 Ohio St.3d 201; State ex rel. Jones v. Conrad (2001), 92 Ohio St.3d 389. In the instant case, one requirement has not been met. Therefore, no valid settlement has taken place in this claim.
 R.C. 4123.65 states that a settlement application "shall include the settlement agreement, be signed by the claimant and employer, and clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable(.)" (emphasis added) The wording of R.C. 4123.65 unambiguously requires that the parties explain in the settlement application, why they wish to settle the claim. It is undisputed that this criterion has not been met in this case. The portion of the settlement application where the parties are specifically told to "Clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable" was left blank.
 R.C. 4123.65 requires that the settlement agreement be sent to the Commission, who shall send such to a staff hearing officer, and that "The staff hearing officer shall determine, within the time limitations specified in division (C) of this section, whether the settlement agreement is or is not a gross miscarriage of justice." It is impossible for a hearing officer to determine whether a settlement of a claim is unjust when no rationale is provided that justifies settling the claim.
 It could be argued that this is precisely the type of case the legislature had in mind when it mandated that the parties to a settlement application provide the reasons why the parties feel settling a workers' compensation claim would be beneficial to them. The claimant in the instant case is mentally retarded and went through school in the special education program. The claimant has a fourth grade comprehension level, but the settlement agreement at issue is obviously written in legal wording that is well beyond that which could be read and understood by a fourth-grader. Therefore, for the minor sum of $2000, the claimant has signed away his rights to his workers' compensation claim *Page 23 
despite the fact that the claimant has already received $14,000 in medical treatment and $3500 in compensation in this claim and despite the fact that the medical evidence shows that the claimant will likely suffer lifelong medical problems due to the serious injuries he sustained on account of this industrial accident. The claimant was unrepresented at the time he signed the settlement agreement and the undisputed testimony and medial evidence produced at hearing shows that the claimant lacked the intellectual capacity to read, let alone understand, the settlement agreement he signed.
 Based upon the law and evidence, I would grant the claimant's appeal, filed 07/25/2002, vacate the Staff Hearing Officer's order, dated 07/08/2002, and grant the claimant's C-86 motion, filed 03/11/2002.
 {¶ 43} 21. On August 19, 2005, relator, Robert D. Wise, filed this mandamus action.
Conclusions of Law:
 {¶ 44} It is the magistrate's decision that this court deny relator's request for a writ of mandamus as more fully explained below.
R.C. 4123.65 states:
 (A) A state fund employer or the employee of such an employer may file an application with the administrator of workers' compensation for approval of a final settlement of a claim under this chapter. The application shall include the settlement agreement, be signed by the claimant and employer, and clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable and that the parties agree to the terms of the settlement agreement * * *.
 * * *
 (C) No settlement agreed to under division (A) of this section * * * shall take effect until thirty days after the administrator *Page 24 
approves the settlement for state fund employees and employers * * *. During the thirty-day period, the employer, employee, or administrator, for state fund settlements, * * * may withdraw consent to the settlement by an employer providing written notice to the employer's employee and the administrator or by an employee providing written notice to the employee's employer and the administrator, or by the administrator providing written notice to the state fund employer and employee.
 (D) At the time of agreement to any final settlement agreement under division (A) of this section * * * the administrator, for state fund settlements, * * * immediately shall send a copy of the agreement to the industrial commission who shall assign the matter to a staff hearing officer. The staff hearing officer shall determine, within the time limitations specified in division (C) of this section, whether the settlement agreement is or is not a gross miscarriage of justice. If the staff hearing officer determines within that time period that the settlement agreement is clearly unfair, the staff hearing officer shall issue an order disapproving the settlement agreement. If the staff hearing officer determines that the settlement agreement is not clearly unfair or fails to act within those time limits, the settlement agreement is approved.
 * * *
 (F) A settlement entered into under this section is not appealable under section 4123.511 or 4123.512 of the Revised Code.
R.C. 4121.35 states:
 (B) * * * [S]taff hearing officers have original jurisdiction to hear and decide the following matters:
 * * *
 (5) Reviews of settlement agreements pursuant to section 4123.65 of the Revised Code. Decisions of the staff hearing officer under that section are final and not appealable to the *Page 25 
commission or to court under section 4123.511 or 4123.512 of the Revised Code.
R.C. 4123.52 provides:
 The jurisdiction of the industrial commission * * * is continuing, and the commission may make such modification or change with respect to former findings or orders with respect thereto, as, in its opinion is justified. * * *
 {¶ 45} R.C. 4123.52 contains a board grant of authority. State ex rel.B C Machine Co. v. Indus. Comm. (1992), 65 Ohio St.3d 538, 541. However, continuing jurisdiction is not unlimited. Id. Its prerequisites are (1 ) new and changed circumstances, (2) fraud, (3) clear mistake of fact, (4) clear mistake of law, or (5) error of inferior tribunal.State ex rel. Nichols v. Indus. Comm. (1998), 81 Ohio St.3d 454.
 {¶ 46} R.C. 4123.65(D) specifically grants authority to SHOs to determine, within the 30-day cooling off period, whether the settlement agreement is or is not a "gross miscarriage of justice." The SHO is also authorized to determine whether the settlement agreement is "clearly unfair." Essentially, R.C. 4123.65(D) grants limited subject-matter jurisdiction to SHOs over the claim settlement process.
 {¶ 47} Under R.C. 4121.35(B)(5), the decision of the SHO on his review of the settlement agreement is final and not appealable to the commission or to a court of common pleas. Presumably, because SHOs are inferior tribunals of the commission, under some circumstances the commission also has limited subject-matter jurisdiction over the claim settlement process. *Page 26 
 {¶ 48} Thus, under some circumstances, the commission itself can exercise its R.C. 4123.52 continuing jurisdiction over decisions of its SHOs who review settlement agreements under R.C. 4123.65.
 {¶ 49} Although relator's March 11, 2002 motion is silent as to the continuing jurisdiction issue, in effect, it asks the commission to invoke its R.C. 4123.52 continuing jurisdiction over the SHO's decision approving the settlement agreement.
 {¶ 50} The DHO's order of April 30, 2002 recognizes the continuing jurisdiction question and addresses relator's theory of an error by an inferior tribunal. The SHO's order of July 8, 2002, which affirms the DHO's order, does not address continuing jurisdiction.
 {¶ 51} The November 14, 2002 commission order, which affirms the SHO's order of July 8, 2002, acknowledges relator's theory of an error by an inferior tribunal, noting that relator claims that the bureau erred when it processed the settlement agreement. The commission's order of November 14, 2002 goes on to find that it does not have continuing jurisdiction. However, in finding that relator failed to prove a clear mistake of law or fact, the commission focused incorrectly upon the SHO's order of July 8, 2002 from which relator took an appeal to the commission. Clearly, there was no issue of continuing jurisdiction over the SHO's order of July 8, 2002.
 {¶ 52} Relator asked the commission to adjudicate at least two issues based upon continuing jurisdiction: (1) whether the settlement agreement must be voided because the application allegedly fails to comply with R.C. 4123.65(A), and (2) whether relator was competent to execute the settlement agreement. Administratively, relator also alleged *Page 27 
that the employer exercised undue influence over relator, but that claim is not pursued here in mandamus. Also, relator administratively claimed that the bureau failed an alleged duty to personally contact relator to make a fairness inquiry since relator was unrepresented. Relator has not pursued that claim here in mandamus either.
 {¶ 53} The commission's order of November 14, 2002 both affirms the SHO's order which addressed the factual merits of relator's incompetency claim, and denies relator's motion on grounds that the commission lacks continuing jurisdiction. Apparently, the commission felt that it had the statutory or subject-matter jurisdiction to determine relator's competency but, because it found relator to be competent, held that it did not have continuing jurisdiction to vacate the settlement agreement. Seemingly, the commission has assumed that it would have the authority to set aside the settlement agreement had it found that relator had proven his incompetency claim.
 {¶ 54} Assuming that the commission had the statutory or subject-matter jurisdiction to address the two issues aforementioned that relator presents here, the magistrate finds: (1 ) the settlement agreement is not void on grounds that the application allegedly fails to comply with R.C. 4123.65(A), and (2) the commission did not abuse its discretion in determining that relator had failed to prove that he was not competent to enter into the settlement agreement.
Turning to the first issue, R.C. 4123.65(A) states in part:
 The application shall include the settlement agreement, be signed by the claimant and employer, and clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable and that the parties agree to the terms of the settlement agreement. *Page 28 
 {¶ 55} Citing State ex rel. Jones v. Conrad (2001), 92 Ohio St.3d 389, relator argues that R.C. 4123.65(A) must be construed to mandate that any and all settlement agreements are void or voidable if the application itself fails to strictly comply with R.C. 4123.65(A). The magistrate disagrees.
 {¶ 56} In Conrad, the claimant, Betty Jones ("Jones"), and the state fund employer filed a settlement agreement. The bureau approved the settlement which commenced the 30-day cooling off period. Five days later, the employer's representative faxed a message to the bureau stating that the employer withdraws from the application. However, the employer did not also send the message to Jones even though R.C.4123.65(C) requires written notice to the bureau and the claimant. Later, within the cooling off period, the bureau issued an order that provided notice to Jones that the employer had revoked its consent and denied the settlement application.
 {¶ 57} In Conrad, after the cooling off period passed, Jones moved the commission for enforcement of the settlement agreement. A commission SHO denied the motion.
 {¶ 58} On Jones' motion for reconsideration, the commission, splitting two to one, denied Jones' motion to enforce the settlement.
The dissenting commissioner in Conrad wrote:
 "The Bureau and the employer argued that the Bureau's order of 2/11/98 satisfied the intent of R.C. 4123.65 because basically the Bureau was acting on behalf of the withdrawing party (the employer) by providing notice to the other party (the employee). R.C. 4123.65 does not provide for the Bureau to act on behalf of any of the other parties in providing written *Page 29 
notice to the other party of the withdrawal of consent from the settlement agreement. In state fund claims, there are three interested parties, each possessing its own interests and goals in a settlement. The Bureau cannot act on behalf of one party to satisfy any statutory obligations that a party may have in effectuating a settlement agreement. The legislature has established a precise manner [in which] an employer, employee, or administrator may withdraw from the settlement agreement.
 "I would find that because the employer did not comply with the clear statutory requirements of R.C. 4123.65(C), there was a valid settlement agreement upon the expiration of thirty days following the 1/30/98 letter from the Bureau. I would [therefore] find that the Staff Hearing Officer order contained clear mistakes of law and fact by finding the following: `This order (the 2/11/98 Bureau order) is found to have fulfilled the statutory requirement that a consent withdrawal be communicated to all parties.' "
 {¶ 59} Thereafter, Jones filed a mandamus action in this court. Agreeing with the dissenting commissioner, this court issued a writ of mandamus. On appeal to the Supreme Court of Ohio, the Conrad court states that it also agrees with the reasoning of the dissenting commissioner. Thus, the Conrad court affirmed this court's judgment and ordered the commission to vacate its order denying the application and to issue a new order enforcing this settlement agreement.
 {¶ 60} Here, relator relies on the reasoning of the dissenting commissioner in the instant case as previously noted. The magistrate disagrees with the dissenting commissioner's reasoning.
 {¶ 61} It does not follow that a failure to clearly set forth, in the application itself, "the circumstances by reason of which the proposed settlement is deemed desirable" *Page 30 
makes it impossible for the SHO to determine whether the settlement agreement is a "gross miscarriage of justice" or that it is "clearly unfair."
 {¶ 62} R.C. 4123.65(D) does not confine the SHO's inquiry to the application itself. Presumably, the SHO has access to the claim file in rendering a determination. Thus, the entire application would not necessarily be essential to the performance of the SHO's duty under R.C.4123.65(D).
 {¶ 63} The magistrate concludes that the instant settlement agreement is not void nor voidable for the failure of the application itself to clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable.
 {¶ 64} The second issue this court is asked to address is whether the commission abused its discretion in determining that relator had failed to prove that he was not competent to execute the settlement agreement.
 {¶ 65} It is well-settled that a party seeking to void a contract on grounds of incapacity has the burden of proof by clear and convincing evidence. Escott v. Timkin Co., 153 Ohio App.3d 529, 532,2003-Ohio-3370.
 {¶ 66} If a person, at the time of a transaction, understands the nature, extent, and scope of the business he is about to transact, and possesses that degree of mental strength which would enable him to transact ordinary business, he is, in law, considered a person of sound mind and memory. Vnerakraft v. Arcaro (1959), 110 Ohio App. 62.
 {¶ 67} In the magistrate's view, the SHO's order of July 8, 2002, which the commission administratively affirmed, sets forth the evidence and the explanation supporting the commission's determination that relator failed to show incompetency. *Page 31 
 {¶ 68} Relator's own testimony as reported by the SHO, is not in dispute. Relator has a checking and savings account and understands that he receives interest on those accounts. He obtained a driver's license and he currently owns a car. He has purchased four automobiles in his life.
 {¶ 69} Clearly, given the findings contained in the SHO's order of July 8, 2002, the commission did not abuse its discretion in determining that relator had failed to prove that he was incompetent to enter into the settlement agreement.
 {¶ 70} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1